FILED

2009 JUN 26 AM 9: 42

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

CLEVELAND OF OHIO

CASE NO. 1 : 09CV1455

TRISTATE CAPITAL BANK )
301 Grant Street, Suite 2700 )
Pittsburgh, Pennsylvania 15219 )

JUDGE **JUDGE OLIVER**

Plaintiff )
)
vs. )

MAG. WHITE

RED ROCK STAMPING LLC )
12600 Rockside Road, Suite 225 )
Garfield Heights, Ohio 44125 )
(additionally served upon its statutory agent: )
Bdb Agent Co. )
3800 Embassy Parkway, Ste. 300 )
Akron, Ohio 44333) )
)
and )
)

**COMPLAINT FOR FRAUD,**
**CONVERSION, CIVIL**
**CONSPIRACY, REPLEVIN AND**
**DAMAGES**

TREMONT MANUFACTURING, LLC )
12600 Rockside Road, Suite 225 )
Garfield Heights, Ohio 44125 )
(additionally served upon its statutory agent: )
Bdb Agent Co. )
3800 Embassy Parkway, Ste. 300 )
Akron, Ohio 44333) )
)
and )
)
HAWTHORN MANUFACTURING )
CORPORATION )
12600 Rockside Road, Suite 225 )
Garfield Heights, Ohio 44125 )
(additionally served upon its statutory agent: )
Bdb Agent Co. )
3800 Embassy Parkway, Ste. 300 )
Akron, Ohio 44333) )
)
and )

COLUMBUS COMPONENTS GROUP, LLC )
2020 15th Street                )
Columbus, Indiana 47201         )
(additionally served upon its statutory agent: )
Bdb Agent Co.                   )
3800 Embassy Parkway, Ste. 300  )
Akron, Ohio 44333)              )
                                )
     and              )
                                )
PATRICK JAMES                   )
15676 North Ridge               )
Novelty, Ohio 44072             )

     and

ELIZABETH JAMES, TRUSTEE OF THE
ELIZABETH L. JAMES TRUST
15676 North Ridge
Novelty, Ohio 44072

     and

CHARLES T. SCHIAVELLO
6020 Turtle Bay Parkway
Columbus, Indiana 47201-7586

     Defendants

Plaintiff Tristate Capital Bank ("Tristate"), for its Complaint against Defendants Red Rock Stamping LLC ("Red Rock"), Tremont Manufacturing, LLC ("Tremont"), Hawthorn Manufacturing Corporation ("Hawthorn"), Columbus Components Group, LLC ("CCG"), Patrick James, Elizabeth James as Trustee of The Elizabeth L James Trust ("Elizabeth James"), and Charles T. Schiavello ("Schiavello") (collectively, "Defendants"), states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Tristate is a Pennsylvania state chartered bank with its principal place of business in Pittsburgh, Pennsylvania.

2.     Defendant Red Rock is an Ohio Limited Liability Company with its principal place of business in Ohio and its former operations in Arizona.

3.     Defendant Tremont is an Ohio Limited Liability Company with its principal place of business in Ohio.

4.     Defendant Hawthorn is an Ohio corporation with its principal place of business in Ohio.

5.     Defendant CCG is an Ohio Limited Liability Company with its principal place of business in Indiana.

6.     Defendant Patrick James is a resident of Ohio.

7.     Defendant Elizabeth James is a resident of Ohio.

8.     Defendant Schiavello is a resident of Indiana.

9.     Defendants Red Rock and Tremont are or previously were affiliated with, and/or share(d) an ownership, and/or are/were operated and/or owned or controlled all or in part by Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello. Additionally, Defendant Hawthorn and the other Defendants (and/or their affiliates) were paid significant management fees and consulting fees by Defendants Red Rock and Tremont. At all relevant times, Schiavello and other employees and agents of both Hawthorn and CCG communicated with Tristate on behalf of Red Rock and Tremont with relation to the issues in this case. In fact, at all relevant times, Patrick James, together with employees and agents of Hawthorn and CCG, have been Tristate's primary contacts. Upon information and belief, both Red Rock and Tremont received instructions and directions on all matters – including bookkeeping and accounting – from the other Defendants.

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as it involves citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     Venue is proper in this district under 28 U.S.C. § 1391(a) because this is a district in which a substantial part of the events or omissions giving rise to the claims occurred, and a substantial part of the property that is the subject of this action is situated in this district.

## FACTUAL ALLEGATIONS

12.     Tristate and Defendants Red Rock and Tremont entered into an April 30, 2008 Credit and Security Agreement ("Credit Agreement," attached hereto as Exhibit A), an April 30, 2008 Revolving Promissory Note in the original principal amount of $5,000,000 ("Promissory Note," attached hereto as Exhibit B), and an April 30, 2008 Term Note in the original principal amount of $1,250,000 ("Term Note," attached hereto as Exhibit C), and filed Uniform Commercial Code Financing Statements with the Secretary of State of Ohio ("Financing Statements," attached hereto as Exhibit D). All of the foregoing documents in this Paragraph are hereafter collectively referred to as the "Loan Documents."

13.     Defendants submitted borrowing base certificates as of the April 30, 2008 loan closing, and for the months of May through September 2008. No offsets associated with the accounts receivable owed by TRW or Autoliv were shown in the borrowing base certificates.

14.     In November 2008, Defendants also submitted a borrowing base certificate to Tristate as is required by the Loan Documents. This borrowing base certificate represented that there were approximately $3.6 million in total accounts receivable and $2.4 Million of total inventory for Red Rock and Tremont. No offsets associated with the accounts receivable owed by TRW or Autoliv were shown in the borrowing base certificates.

15.     Unbeknownst to Tristate, the accounts receivable shown in the borrowing base certificates for November 2008 and the prior months were actually subject to very significant offsets that were required to have been disclosed in the borrowing base certificates pursuant to the terms of the Loan Documents.

16.     On December 16, 2008, Tristate was orally informed by Defendant Patrick James and employees or agents of the remaining Defendants that the Red Rock operations had been shut down and the assets were being sold or liquidated with the proceeds going to repay the Tristate loans.  Patrick James assured Tristate that there was sufficient Collateral (as defined in the Loan Documents) to repay the Tristate loans in full, and that the Tremont operations would be sufficient to service the loans in accordance with their terms.

17.     No borrowing base certificates were submitted in October 2008 or December 2008 or January 2009, despite the fact that Red Rock and Tremont were obligated under the terms of the Loan Documents to submit such certificates, and Tristate repeatedly demanded delivery of same.

18.     On or about February 5, 2009, Defendants' submitted a borrowing base certificate for Tremont and Red Rock as of year-end 2008 (the "December 31st BBC," a copy of which is attached hereto as Exhibit E) whereby the Defendants' misrepresentations and omissions led Tristate to reasonably believe that adequate collateral existed for the repayment of all or substantially all loan advances outstanding.  The December 31st BBC showed that Red Rock and Tremont had over $3.17 Million in total accounts receivables, and $1.4 Million in total inventory.

19.     Unbeknownst to Tristate, the accounts receivable shown in the December 31st BBC were actually subject to even higher offsets than in November, all of which were required

to have been disclosed in the borrowing base certificates pursuant to the terms of the Loan Documents.

20.     Due to Defendants' misrepresentations and omissions, Tristate reasonably had an incorrect impression of Red Rock and Tremont's financial strength as of year-end 2008, with adequate collateral for the loans outstanding, notwithstanding the shut down of the Red Rock operations.

21.     It was not until February 12, 2009 that Tristate was first informed by Defendant Patrick James and employees and agents of the other Defendants that there were very significant offsets to the accounts receivable, and that the Tremont operations would also be terminated. Tristate did not have any knowledge of these offsets to the accounts receivable prior to this disclosure.

22.     At no time did Red Rock or Tremont inform Tristate that a significant portion of their inventory collateral had been converted by the other Defendants.

23.     Defendants Red Rock and Tremont have defaulted on obligations pursuant to the Loan Documents.

24.     Section 6.1 of the Credit Agreement states that "[i]n consideration of and as security for the full and complete payment of all of the Secured Debt, Borrower hereby creates and provides for in favor of Tristate, and grants to Tristate, a security interest in and an assignment of the Collateral of Borrower."

25.     Section 6.1(a) of the Credit Agreement defines "Collateral" to include, among other things, "all Accounts, all Chattel Paper, all Deposit Accounts, all Documents, all Equipment, all fixtures, all General Intangibles, all Instruments, all Investment Property, all Inventory, all letters of credit (whether or not evidenced by a writing), all Letter of Credit Rights,

all Receivables, and all Supporting Obligations in which Borrower now has or hereafter acquires any rights or any power to transfer rights."

26.　　Pursuant to Section 6.2 of the Credit Agreement, "Collateral" also includes property acquired after the Credit Agreement was executed.

27.　　On or about March 13, 2009, Tristate and Defendants Red Rock and Tremont executed and delivered a Wind Down, Surrender, Consent to Acceptance of Collateral and Partial Strict Foreclosure Agreement ("Wind Down Agreement," a copy of which is attached hereto as Exhibit F).

28.　　A wind down and surrender agreement was not executed earlier than March 2009 because Defendants' misrepresentations and omissions related to the accounts receivable and inventory of Red Rock and Tremont, and the misrepresentations and omissions of Defendant Patrick James and other employees/agents of the Defendants, gave Tristate a false understanding of those companies' financial strength and the value of the collateral securing the loans.

29.　　The Wind Down Agreement states that all of the obligations of the Loan Documents "are secured by all the assets of Debtors of every kind or nature, whether tangible or intangible, whether owned at the date of the Loan Documents or thereafter acquired, wherever the same may be located, in which Lender has a security interest as Collateral (as defined in the Credit Agreement) pursuant to the Loan Documents."

30.　　Defendants acknowledge in the Wind Down Agreement that "Debtors have terminated the normal course of business and operations, are in continuing default of their obligations under the Loan Documents, and Lender has demanded that the loans be repaid in full. Debtors are unable to comply with the Lender's demand."

31. In the Wind Down Agreement, it is also acknowledged that the "Debtors are insolvent and unable to pay their obligations to Lender under the terms of the Loan Documents, or the debts and obligations as they come due to Debtors' unsecured creditors."

32. The Wind Down Agreement states that the Debtors shall "surrender, assign and transfer to Lender the Collateral . . . . The 'Collateral' includes all the assets of Debtors, where located, whenever acquired, tangible or intangible, including but not limited to all accounts, chattel paper, general intangibles, cash, deposit accounts, investments, and licenses."

33. The Wind Down Agreement states that "Debtors agree to relinquish and surrender possession of the Collateral in its current location to Lender, or its designee. Debtors shall remain liable for the deficiency amount on the Loans."

34. The Wind Down Agreement provided mutual releases by and among Tristate, Red Rock and Tremont, but also conditioned such release as follows: "provided, however, that the foregoing release of the Debtors shall be null and void, and of no force and effect, to the extent Lender discovers any *fraud or material, intentional misrepresentation by Debtors* made in, or in connection with, i) the Credit Agreement or the transactions contemplated by the Credit Agreement, ii) regarding the miss-direction of loan proceeds for purposes not generally related to the acquisition of the Debtors' business assets and/or the general business purposes of the Debtors, or iii) that materially hinders or prevents the Lender's liquidation or other disposition of the Collateral" (emphasis added).

35. Exhibit B to the Wind Down Agreement defines "Collateral" to include, among other things, "all Accounts, all Chattel Paper, all Deposit Accounts, all Documents, all Equipment, all fixtures, all General Intangibles, all Instruments, all Investment Property, all Inventory, all letters of credit (whether or not evidenced in writing), all Letter of Credit Rights,

all Receivables, and all Supporting Obligations in which Borrower now has or hereafter acquires any rights or any power to transfer rights."

36.     Exhibit C to the Wind Down Agreement is a Bill of Sale, Assignment and Transfer, fully executed by Tristate, Red Rock, and Tremont, which states that "Debtors do hereby bargain, sell, surrender, assign, transfer and convey to Lender, its successors and assigns, all of Debtors' right, title and interest to their assets."

37.     Pursuant to the terms of the Loan Documents and the Wind Down Agreement, Defendants are obligated to transfer to Tristate all of Red Rock and Tremont's computers (and all data and information stored on the computers, including, but not limited to, any information stored on internal or external hard drives, disks, tapes, and/or jump or flash drives), books, financial records, sales reports, purchase orders, purchase agreements, invoices, information related to accounts receivable, trial balance reports, inventory listings, finished goods listings, balance sheets, credit memos, ledger sheets, names and addresses of customers, and other records and files (collectively "Business Records").

38.     After the execution of the Wind Down Agreement, Tristate repeatedly demanded that Tremont and Red Rock turn over their Business Records, including but not limited to the office computers and computer servers which had been physically removed by one or more of the Defendants from the Ohio and Arizona business properties.

39.     Tremont or one of the other Defendants partially complied with Tristate's demands, and caused four (4) boxes of financial records concerning Tremont to be delivered to Tristate's attorneys on or about April 30, 2009. Following additional requests, Red Rock or one of the other Defendants partially complied with Tristate's demands, and caused thirty-four boxes of financial records and a computer backup drive concerning Red Rock to be delivered to

Tristate's agent on or about May 6, 2009 (all of the records described in this paragraph are defined as the "Partial Records Production").

40.     Upon review of the Partial Records Production, Tristate discovered significant undisclosed offsets to the accounts receivable which the Defendants hid from Tristate.

41.     Rather than identifying these debits or offsets as what they were – *i.e.*, credits owed to customers and corresponding offsets or deductions from the accounts receivable – Defendants instead accounted for these debits by creating false payables entries on the internal accounting records in an effort to fraudulently hide the offsets from Tristate.

42.     These "payables" – which in reality were credits owed to customers – were given the cryptic label "Accruals/WH."  Defendants' internal accounting documents – which were not provided to Tristate until after the Wind Down Agreement as part of the Partial Records Production – state (buried on a sub page of a spreadsheet) with regard to this fabricated Accruals/WH category, that "[t]his is where the TRW and Autoliv steel debits have been moved to." (Copy attached hereto as Exhibit G).

43.     Additionally, the Defendants hid this fabricated "Accruals/WH" entry by omitting same from the Accounts Payable list submitted to Tristate by the Defendants simultaneously with the December 31st BBC (a copy of which is attached hereto as Exhibit H).

44.     Even if the Defendants had included the listing of "Accruals/WH" on Red Rock's and Tremont's payables lists, Tristate could never have deciphered the fabricated "Accruals/WH" category to understand its real identity as offsets or debits against the accounts receivable otherwise owed by TRW and Autoliv.

45.     Moreover, the Defendants either omitted the creation of, or physically removed and/or destroyed, the corresponding credit memos from the actual invoice and account records,

in particular for the invoices issued to TRW and Autoliv, so as to further hide the offsets that should have been made against the accounts receivable on the borrowing base certificates.

46.     The borrowing base certificates submitted by the Defendants list the value of the accounts receivable and inventory, which values then determine the amount of money which may be advanced to the borrowers from time to time under the Loan Documents. As described above, Tristate had a first and best security interest in all accounts receivable and inventory pursuant to the Loan Documents.

47.     Because the Defendants hid the credits owed to TRW and Autoliv, and omitted the deduction of those credits against the accounts receivable shown on the borrowing base certificates actually submitted, the accounts receivable portion of the borrowing base certificates were intentionally and fraudulently overstated by hundreds of thousands of dollars.

48.     If the fabricated Accruals/WH are given their full effect as shown on material discovered from the Partial Records Production, the accounts receivable shown on the borrowing base certificates were intentionally and fraudulently overstated by $756,000 for the month of April 2008 (when the loan closed), by $506,000 for the month of May 2008, $518,000 for June 2008, $491,000 for July 2008, $257,000 for August 2008, $577,000 for September 2008, $357,000 for November 2008, and $1,015,000 for December 2008.

49.     Inventory value was also listed by the Defendants on the borrowing base certificates of Tremont and Red Rock.

50.     By piecing together seemingly unrelated entries, invoices, and credit memos found by Tristate in the Partial Records Production, Tristate discovered that over Five Hundred Seventy Five Thousand Dollars ($575,000) of inventory was "sold" in late 2008 or early 2009, first from Red Rock to Tremont. Then, Tremont immediately invoiced CCG for the same

inventory in the amount of $575,000, and simultaneously issued a credit memo for the same amount in order to fraudulently transfer that inventory to CCG, all without adequate consideration.

51. Upon information and belief, Red Rock and Tremont were insolvent at the time of the transfer of the inventory without consideration.

52. The fraudulent transfer to CCG of inventory caused the value of inventory listed on the borrowing base certificates submitted by the Defendants to be materially misleading by more than $575,000.

53. Defendants never disclosed to Tristate the transfer of inventory to CCG, or that the listing of inventory value on the borrowing base certificates was materially misleading.

54. Defendants intended Tristate to rely upon the borrowing base certificates submitted, and Tristate reasonably relied upon those borrowing base certificates to its detriment.

55. Pursuant to a Subordination Agreement by and among Tremont, Red Rock, Hawthorn and Tristate, both Tremont and Red Rock were prevented from paying management fees to Hawthorn if the cash flow coverage ratio was less then 1.15 to 1.00, those fees exceeded $500,000 in any 12 month period, or there was a default on the loans owed to Tristate. A copy of the Subordination Agreement is attached hereto as Exhibit I.

56. Pursuant to Section 2.5 of the Subordination Agreement, Defendant Hawthorn is required to hold in trust any management fees paid to Hawthorn in violation of the Subordination Agreement.

57. Upon information and belief, and following review of the Partial Records Production, Tristate discovered that, in late 2008 and early 2009, at a time when Red Rock had already shut down all operations, when the borrowers could not possibly have achieved the

criteria set forth in the Subordination Agreement, when an event of default had occurred and was continuing, and when both Red Rock and Tremont were insolvent, Red Rock and Tremont wrongfully paid management fees ("Management Fees") in the hundreds of thousands of dollars to the Defendants or their affiliates, including but not limited to Hawthorn and a payee indentified as "PJ Management."

58.     Upon information and belief, and following review of the Partial Records Production, Tristate discovered that, in late 2008 and early 2009, at a time when Red Rock and both Red Rock and Tremont were insolvent, Red Rock and Tremont wrongfully paid consulting fees ("Consulting Fees") to the Defendants and/or their affiliates in excess of One Million Three Hundred Eighty Thousand Dollars ($1,380,000).

59.     Upon information and belief, review of the Partial Records Production reveals the Defendants apparently revised their internal financial statements to significantly increase the trade debt and payables owed by Red Rock and Tremont in the last quarter of 2008 and early 2009, to hide the excessive level of Management Fees and Consulting Fees paid to or for the benefit of the other Defendants.

60.     Section 6.1(f) of the Credit Agreement defines "Collateral" to also include, among other things, "**all recorded data of any type, including ledger sheets, files, books, records, documents, and instruments (including, but not limited to, computer records, disks, tapes and related electronic media)** evidencing an interest in or relating to [the other defined Collateral]" (emphasis added).

61.     Exhibit B to the Wind Down Agreement also defines "Collateral" to include, among other things, "**all recorded data of any type, including ledger sheets, files, books, records, documents, and instruments (including, but not limited to, computer records,**

**disks, tapes and related electronic media)** evidencing an interest in or relating to [the other defined Collateral]" (emphasis added).

62.     Additional Collateral and Business Records are currently in the possession of one or more of the Defendants, including, but not limited to, (i) an AS 400 computer together with the business records, data, and COGNOS Accounting System and software contained thereon, and (ii) three large presses located at the former Dickey Grabler location (a predecessor to Defendant Tremont).

63.     Despite repeated demands from Tristate, Defendants have refused to turn over all of Red Rock and Tremont's Collateral and Business Records, including but not limited to the AS 400 computer and the three large presses.

64.     Without the Business Records, Tristate is incapable of fully collecting receivables from Red Rock and Tremont's customers, as Tristate is entitled to do under the terms of the Loan Documents and the Wind Down Agreement.

65.     The value of the withheld Collateral and Business Records exceeds $75,000.

66.     Upon information and belief, Defendants Patrick James and/or Elizabeth James are the sole or controlling owners of each of the other entity Defendants and their affiliates.

67.     At all relevant times, Defendant Schiavello was the Chief Financial Officer of Defendant CCG. Upon information and belief, Defendant Schiavello created and directed all account entries for Defendants Red Rock and Tremont, as well as the submission to Tristate of the borrowing base certificates and other financial reports.

68.     Defendant Schiavello and other Employee and agents of Defendants Hawthorn and CCG have been Tristate's primary contacts from the commencement of the lending relationship and throughout the wind down process.

69. Upon information and belief, Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello made all material management decisions and exercised complete control and dominance over Defendants Red Rock and Tremont so that neither Red Rock nor Tremont had separate minds, wills, or existences of their own.

## COUNT I

### (Fraud)

70. Tristate incorporates by reference as though fully rewritten herein all of the allegations contained in paragraphs 1 through 69 of this Complaint.

71. For the months of April 2008 through September 2008, Defendants falsely represented to Tristate that Red Rock and Tremont had significantly more accounts receivable than they actually had, with no offsets for credits due to TRW and/or Autoliv.

72. In November 2008, Defendants falsely represented to Tristate that Red Rock and Tremont had approximately $3.6 million in total accounts receivable with no offsets for credits due to TRW and/or Autoliv. On the December 31st BBC, the Defendants falsely represented to Tristate that Red Rock and Tremont had approximately $3.17 million in total accounts receivable with no offsets for credits due to TRW and/or Autoliv. Those false representations to Tristate continued until mid February, 2009.

73. These false representations or omissions of fact were made with knowledge of their falsity at the time they were made or with utter disregard and recklessness about their falsity. Defendants knew that Red Rock and Tremont did not have $3.6 million in accounts receivable in November, or $3.17 million in accounts receivable as of December 31, 2008, with no offsets for credits due to TRW and/or Autoliv at the time that the representations were made.

74.     Defendants further committed fraud by concealing the offsets by failing to timely submit borrowing base certificates in October, December, and January despite the fact that they had a duty to do so pursuant to the terms of the Loan Documents, and Tristate repeatedly demanded the submission of those certificates.

75.     Defendants further committed fraud by concealing their fraudulent transfer of inventory to Defendant CCG without adequate or any consideration, causing an overstatement of the inventory value by more than $575,000, and denying the value of such inventory to Tristate on its Collateral.

76.     Defendants further committed fraud by spiriting away in excess of $1.5 Million in Management Fees and Consulting Fees paid to Hawthorn and/or its affiliates at a time when Red Rock had shut down and Tremont could not have possibly satisfied the criteria for payment of any Management Fees or Consulting Fees.  Moreover, no distributions from Red Rock or Tremont were permitted by the Loan Documents, so no management or consulting fees should have been paid at all.

77.     Upon information and belief, Defendants Red Rock and Tremont were insolvent at the times of the i) fraudulent transfer of inventory to CCG,  and ii) the fraudulent transfer of Management Fees and Consulting Fees to the Defendants and/or their affiliates.

78.     Upon information and belief, these fraudulent misrepresentations, omissions and transfers were made by Red Rock and Tremont at the direction of Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and/or Schiavello.  Upon information and belief, Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and/or Schiavello controlled and directed Red Rock and Tremont's accounting practices.

79.     Defendants knew and intended that Tristate would rely upon their false representations and omissions. They nevertheless knowingly made false representations and omissions in order to prevent Tristate from calling the loans and demanding repayment.

80.     Tristate believed Defendants' representations to be true and reasonably and justifiably relied on them.

81.     On the basis of Defendants' false representations, omissions, and misleading statements, Tristate was over-advanced on its loans as early as May 2008 and induced to delay calling the loans, seizing the Collateral and demanding repayment pursuant to the terms of Loan Documents. Tristate would have called the loans and seized the Collateral absent Defendants' representations.

82.     As a direct and proximate result of Defendants' fraudulent acts, and as a result of Tristate's reasonable and justifiable reliance on Defendants' false representations, Tristate has been damaged, and will continue to be damaged. Tristate is entitled to an award of damages against Defendants, jointly and severally, to compensate Tristate for all loss proximately caused by Defendants' fraudulent acts, in an amount to be determined at trial, including but not limited to the damages caused to Tristate because of its delayed calling of the loans and demand for repayment pursuant to the terms of the Loan Documents, plus interest (calculated at the default rate set forth in the Loan Documents), costs, consequential damages, incidental damages, and attorneys' fees in an amount that is yet to be determined.

83.     Because Defendants' actions were done willfully, wantonly, maliciously, and fraudulently, and with the intent to cause damage to Tristate, Tristate is entitled to, and seeks, an award of punitive damages and attorneys' fees.

## COUNT II

### (Conversion)

84.     Tristate incorporates by reference as though fully rewritten herein all of the allegations contained in paragraphs 1 through 83 of this Complaint.

85.     Upon information and belief, in late 2008 and/or early 2009 – when it was clear to Defendants that they were in default of the Loan Documents – over $575,000 worth of Red Rock's inventory was transferred to CCG without any compensation from CCG to Red Rock.

86.     The inventory constituted Collateral in which Tristate had a first and best security interest. Because Red Rock was in default of the Loan Documents at the time, this inventory and/or the rightful proceeds thereof belonged to Tristate as collateral, and should have been used to partially repay the loans.

87.     Upon information and belief, Red Rock and Tremont were insolvent at the time Red Rock's inventory was transferred to CCG.

88.     By transferring the inventory from Red Rock to CCG without any compensation from CCG to Red Rock, Defendants willfully, maliciously, and wantonly took unlawful possession of the inventory in which Tristate had a security interest and exercised dominion and/or control over the inventory inconsistent with Tristate's security interests in the inventory, and continues to do so.

89.     CCG's improper retention of the inventory constitutes an exercise of dominion and control to the exclusion of the rights and interests of Tristate.

90.     Due to the fraudulent nature of the transfer of the inventory from Red Rock to CCG, CCG has no claim of right to the inventory.

91.     The Tristate security interest remains in the inventory wrongfully transferred to CCG, which security interest also attaches to the proceeds of all such inventory.

92.     Further, upon information and belief, the money fraudulently transferred to Defendant Hawthorn as Management Fees and Consulting Fees constituted proceeds from the accounts receivable and inventory generated during the prior operations of Red Rock and Tristate, and therefore such proceeds constituted either or both Loan proceeds improperly used in violation of the Loan Documents and/or Collateral in which Tristate had a perfected first and best security interest.

93.     By transferring unconscionable sums in Management Fees and Consulting Fees, directly and indirectly, to Defendant Hawthorn, the other Defendants and their affiliates, at a time when the Red Rock and Tremont were insolvent, the Defendants willfully, wantonly, and maliciously, and with intent to cause damage to Tristate, stripped the businesses of money and Collateral which otherwise should have been paid to Tristate to pay down the loans.

94.     As a direct and proximate result of Defendants' actions, Tristate has been injured and seeks compensatory damages, jointly and severally from the Defendants, in an amount to be determined at trial.

95.     Because Defendants' actions were done willfully, wantonly, and maliciously and with the intent to cause damage to Tristate, Tristate is entitled to, and seeks, an award of punitive damages.

## COUNT III

### (Conspiracy)

96.     Tristate incorporates by reference as though fully rewritten herein all of the allegations contained in paragraphs 1 through 95 of this Complaint.

579/1779099.4

97.     Defendants each intentionally conspired to (1) defraud Tristate, (2) wrongfully strip the businesses of over $1.5 Million in Management Fees and Consulting Fees at a time when Red Rock and Tremont were insolvent and in default under the Loan Documents, and (3) convert the Collateral and Business Records and other property in which Tristate holds a first and best security interest. The payment of such Management and Consulting Fees also were a wrongful misapplication of the Loan proceeds.

98.     One or more of the conspirators engaged in overt and deliberate acts and omissions to further the conspiracy.

99.     The intentional acts undertaken by one or more of the conspirators in furtherance of the conspiracy were tortuous and unlawful, and Tristate has been injured as a direct and proximate result of the Defendants' conspiracy, and Tristate is entitled to damages, jointly and severally from the Defendants, in an amount to be determined at trial.

100.    Tristate is also entitled to preliminary and permanent injunctive relief, requiring the Defendants to immediately release the Collateral and Business Records to Tristate.

101.    Tristate is also entitled to preliminary and permanent injunctive relief, requiring the Defendants to immediately disgorge all the Management Fees and Consulting Fees wrongfully paid, directly or indirectly, to Hawthorn, the other Defendants, and any of their affiliates (including, but not limited to PJ Management).

102.    Defendants' overt and deliberate acts in furtherance of the conspiracy were, and are, willful, wanton, conspiratorial, and malicious. Accordingly, Tristate is entitled to an award of punitive damages.

## COUNT IV

### (Breach of Contract and Demand for Specific Performance)

103.     Tristate incorporates by reference as though fully rewritten herein all of the allegations contained in paragraphs 1 through 102 of this Complaint.

104.     The Loan Documents, Subordination Agreement and the Wind Down Agreement are valid, binding, and enforceable contracts.

105.     Tristate has fully performed all of its obligations under the Loan Documents, Subordination Agreement and the Wind Down Agreement, and all conditions precedent to the full performance of the Defendants have been satisfied.

106.     Defendants' refusal to release the Collateral and Business Records constitutes a continuing material breach of both the Loan Documents and the Wind Down Agreement.

107.     Defendants' refusal to disgorge the Management Fees paid, directly or indirectly, to Defendant Hawthorn, to the other Defendants and/or any of their affiliates (including, but not limited to PJ Management) constitutes a continuing material breach of the Subordination Agreement, and a breach of Defendant Hawthorn's fiduciary duties with respect to such payments.

108.     Upon information and belief, the Defendants intentionally attempted to avoid the purpose, intent, terms, provisions and restrictions of the Subordination Agreement by miss-characterizing management fees as consulting fees. Accordingly, all Consulting Fees should be held in trust pursuant to the terms and provisions of the Subordination Agreement, and the Defendants' refusal to disgorge the Consulting Fees paid, directly or indirectly, to Defendant Hawthorn, to the other Defendants and/or any of their affiliates (including, but not limited to

PJ Management) constitutes a continuing material breach of the Subordination Agreement, and a breach of Defendant Hawthorn's fiduciary duties with respect to such payments.

109. Even if the Consulting Fees are not the equivalent of Management Fees controlled by the Subordination Agreement, pursuant to the terms and provisions of the Credit Agreement and separate written subordination agreements entered into by and between Tristate, Patrick James, Elizabeth James, Red Rock and Tremont (collectively, the "James Subordination Agreements", attached hereto as Exhibits J and K), Red Rock and/or Tremont were expressly prevented from making any distributions (however characterized) to the other Defendants. Any payment of such distributions to the other Defendants and/or to any of their affiliates is a breach of contract, and a constructive trust should be imposed upon such Defendants and their affiliates with regard to all Consulting Fees, all of which should be immediately disgorged and paid to Tristate.

110. As a direct and proximate result of Defendants' continuing breaches of the Loan Documents, Subordination Agreement and the Wind Down Agreement, Tristate has been, and will continue to be, irreparably harmed if Defendants do not specifically perform their obligations under the Loan Documents, the Subordination Agreement, the James Subordination Agreements, the James subordination Agreements, and the Wind Down Agreement.

111. Unless Defendants are ordered to specifically perform their obligations under the Loan Documents, the Subordination Agreement, the James Subordination Agreements, and the Wind Down Agreements, Tristate will continue to be irreparably harmed.

112. Tristate's remedies at law are inadequate to remedy the harm.

113. The Defendants therefore should be ordered to specifically perform their obligations pursuant to the Loan Documents, the Subordination Agreement, the James

Subordination Agreements, and the Wind Down Agreement, should be ordered to release the Collateral and Business Records to Tristate, and ordered to disgorge the Management Fees and Consulting Fees wrongfully paid, directly or indirectly, to Defendant Hawthorn, to the other Defendants, and/or to any of their affiliates.

114.    Tristate is also entitled to compensatory damages incurred as a result of the Defendants' breaches, in an amount to be determined at trial, including consequential damages, incidental damages, and interest at the default rate set forth in the Loan Documents.

**COUNT V**

**(Replevin)**

115.    Tristate incorporates by reference as though fully rewritten herein all of the allegations contained in paragraphs 1 through 114 of this Complaint.

116.    Pursuant to both the Loan Documents and the Wind Down Agreement, Defendants granted Tristate a security interest in the Collateral and Business Records and the accounts receivable associated with those Business Records.

117.    By virtue of Defendants' default upon their payment obligations set forth in the Loan Documents, and as explicitly recognized in the Wind Down Agreement, Tristate is lawfully entitled to possession of the Collateral and Business Records pursuant to the terms of both the Loan Documents and the Wind Down Agreement.

118.    Tristate has repeatedly demanded delivery of the Collateral and Business Records, but Defendants have refused to return all of the Collateral and Business Records to Plaintiff, including but not limited to (i) the AS 400 computer, together with the Business Records, data, and COGNOS Accounting System and software contained thereon, and (ii) the three large presses located at the former Dickey Grabler location of Tremont.

119.    Defendants are wrongfully detaining the Collateral and Business Records from Tristate, and have therefore converted Tristate's collateral, and are using Tristate's converted collateral for their own benefit.

120.    Defendants' refusal to release the Collateral and Business Records is unlawful.

121.    If Defendants do not release the Collateral and Business Records immediately to Tristate, then the Collateral and Business Records may be damaged, destroyed, concealed, disposed of, or used in such a way as to substantially impair their value.

122.    If Defendants do not release the Collateral and Business Records to Tristate, then Tristate will suffer irreparable harm.

123.    Tristate therefore respectfully requests that this Honorable Court enter an order granting Tristate its right to Replevin the Property immediately.

## COUNT VI

### (Alter Ego/Piercing the Corporate Veil)

124.    Tristate incorporates by reference as though fully rewritten herein all of the allegations contained in paragraphs 1 through 123 of this Complaint.

125.    Upon information and belief, Defendants Patrick James and/or Elizabeth James are the sole or controlling owners of each of the other Defendants.

126.    Employees and agents of Defendants Hawthorn and CCG have been Tristate's primary contacts throughout the wind down process.

127.    Upon information and belief, Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and/or Schiavello controlled and directed Red Rock and Tremont's accounting practices.

128.     Upon information and belief, the fraudulent misrepresentations, omissions, acts and actions alleged herein were made by and/or at the direction of Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello.

129.     Upon information and belief, the Defendants intentionally and materially misrepresented the value of the accounts receivable and inventory of Red Rock and Tremont, by omitting or failing to disclose the offsets due to TRW and Autoliv against the accounts receivable, thereby misleading Tristate to advance more money than should have been advanced pursuant to the Loan Documents and to reasonably believe that adequate collateral existed to repay the outstanding loans.

130.     Upon information and belief, when it was clear to Defendants that they were in default of the Loan Documents, and Red Rock and Tremont were insolvent, over $575,000 worth of Red Rock's inventory was fraudulently transferred to CCG without any compensation from CCG to Red Rock. This inventory constitutes the Collateral of Tristate in which Tristate holds a first and best security interest. CCG holds such inventory subject to the security interest of Tristate, which security interest attaches directly to any and all proceeds thereof and there from.

131.     Upon information and belief, either through a wrongful use of the Loan proceeds, or when it was clear to Defendants that they were in default of the Loan Documents and Red Rock and Tremont were insolvent, over $1.5 Million in Management Fees and Consulting Fees were fraudulently transferred to Defendant Hawthorn, to the other Defendants, or to their affiliates, striping those funds out of the failed businesses of Red Rock and the failing business of Tremont. Because Red Rock and Tremont were in default of the Loan Documents at the time, and were insolvent, those funds should be disgorged and paid to Tristate.

132. Upon information and belief, the Collateral and Business Records are currently, or were at one time, in the possession of Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and/or Schiavello, and these Defendants have willfully converted the Collateral and Business Records and wrongfully refused to release them to Tristate.

133. Upon information and belief, Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello made all material management decisions and exercised complete control and dominance over Defendants Red Rock and Tremont so that neither Red Rock nor Tremont had separate minds, wills, or existences of their own. The Defendants are alter egos of one another as they are indistinguishable.

134. Upon information and belief, Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello had authority to make final decisions in Red Rock and Tremont's company affairs.

135. As the alter ego of Defendants Red Rock and Tremont, Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello are responsible for the actions of Red Rock and Tremont.

136. Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello have exerted control over the Defendants Red Rock and Tremont in such a manner as to commit unjust, fraudulent, wrongful, dishonest, or inequitable acts against Tristate.

137. Defendants Hawthorn, CCG, Patrick James, Elizabeth James, and Schiavello have been conducting, managing, and controlling the affairs of Defendants Red Rock and Tremont with respect to Tristate's claims herein, using the separate company identities for the purpose of unjustly attempting to shield themselves from prospective liability.

138. Due to the Defendants' wrongful acts described herein, they are liable for the wrongful conduct described above under principles that allow Tristate to "pierce the corporate veil."

139. Tristate suffered injury as a direct and proximate result of Defendants' control and wrongdoing. As such, the Defendants are jointly and severally liable to Tristate.

140. Because Defendants' actions were taken with ill will, spite, and malice, Tristate is also entitled to punitive damages.

WHEREFORE, Tristate respectfully requests that the Court enter judgment in favor of Tristate and against the Defendants, awarding the following relief:

(1) An Order granting Plaintiff all of its compensatory damages, jointly and severally from the Defendants, interest (at the default rates set forth in the Loan Documents), attorneys' fees, expenses and costs;

(2) An Order awarding punitive damages to Tristate by reason of the Defendants' willful and malicious acts;

(3) An Order that (a) Tristate be permitted to recover and take possession of the Collateral and Business Records; (b) Defendants are required to immediately release the Collateral and Business Records to Tristate; and (c) Tristate is entitled to final and permanent possession of the Collateral and Business Records;

(4) An Order that (a) the Defendants are required to immediately disgorge all Management Fees and Consulting Fees paid to or for the benefit of any of the Defendants and/or to any of their affiliates, and (b) that Tristate is entitled to final and permanent possession of such amount to the extent the loans, interest, fees and expenses (including, but not limited to attorneys fees) remain unpaid, and any other amounts awarded by this Court;

(5)     An Order requiring Defendants to specifically perform their obligations under the

Loan Documents and the Wind Down Agreement; and

(6)     All other relief as the Court deems just and proper.

*Brad A. Sobolewski*

Brad A. Sobolewski (0072835)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, OH 44113-1448
Tel: (216) 583-7000
Fax: (216) 583-7001
bsobolewski@ulmer.com
Attorney for Plaintiff